# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| MARK ROBINSON, | : | Case No. 3:16-cv-00505 |
| | : | |
| Plaintiff, | : | District Judge Thomas M. Rose |
| | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| | : | |
| NANCY A. BERRYHILL, | : | |
| Commissioner of the Social | : | |
| Security Administration, | : | |
| | : | |
| Defendant. | : | |

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.      Introduction

Plaintiff Mark Robinson applied for Disability Insurance Benefits and Supplemental Security Income in August 2013, asserting that he could no longer work due to his health problems and their negative impact on him.  An Administrative Law Judge (ALJ), George D. McHugh, conducted a hearing during which both Plaintiff and a vocational expert testified.  Shortly thereafter, ALJ McHugh concluded that Plaintiff was not eligible for benefits and denied his applications because he was not under a "disability" as defined by the Social Security Act.

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff filed this case challenging the ALJ's non-disability finding. The case is presently before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #15), Plaintiff's Reply (Doc. #16), and the administrative record. (Doc. #6).

## II.     Background

### A.     <u>Plaintiff</u>

Plaintiff's Memorandum indicates that at all relevant times, he has been more than 50 years old and is thus considered a "person closely approaching advanced age" under social security regulations. Plaintiff turned age 50 in May 2013. On his asserted disability onset date, he was 46 years old. He graduated from high school. Before he applied for social-security benefits, he worked as a laundry sorter, a telemarketer, a cook, a salesperson, and a banquet-setup person.

Plaintiff has diabetes and "very bad" neuropathy in his feet and legs. (Doc. #6, *PageID* #s 86-87). He wears compression stockings every day. *Id*. at 87. Nevertheless, the bottom of his feet become red, and he experiences an "extreme" burning pain and a lot of numbness in all his toes. *Id*. at 87-88. Pain travels up his legs and does not drop below a six-out-of-ten on a pain scale. *Id*. at 88-89. On bad days, which occur three to four times per week, his pain is so severe that he can barely stand. *Id*. at 88-89, 96-97. Even on better days, he relies upon a walker and needs to stop and rest when walking. *Id*. at 95-96. He rests by sitting for three to five minutes. *Id*. at 96. He could not walk to the bus

station, about three blocks, without using a walker and taking breaks to sit. *Id*.

Plaintiff also suffers from breathing problems and can become short of breath even when just sitting still and talking. *Id*. at 82. His breathing varies from day-to-day and becomes worse when he is active. He has asthma attacks and relies upon inhalers. *Id*. at 82-84. Medication causes him to frequently use the bathroom, "constantly … going back and forth to the restroom," he said. *Id*. at 79.

In May 2015, Plaintiff was assaulted by three men. He fractured his right ankle while trying to run away. *Id*. at 89-90. It was a severe break that required surgical fixation with hardware. *Id*. at 90-91. Once surgical screws were removed, he wore a boot on his right ankle. This helped him walk around but he could not bear any weight on it. *Id*. at 91.

During a typical day, Plaintiff helps his "grandson get ready for school, walks … to the bus stop, come[s] back home." *Id*. at 93. He reported, "I sit around, basically watch a little bit of television, get up and try to straighten up the house if it need[s] it…." *Id*. He sometimes goes the grocery store. He does laundry, folds clothes, and puts them away. *Id*. at 94. He does not sweep or mop because he gets dizzy if he bends over. He is able to vacuum the floor. *Id*. He visits his sister sometimes and will go outside and sit if it is not hot or humid. *Id*. at 94-95. He takes walks every now and then. He does no volunteer work. *Id*. at 95.

**B.     Medical Records: Pre-Ankle Fracture**

In May 2013, Plaintiff went to the emergency room because he was suffering from burning pain in his legs and feet.  (Doc. #6, *PageID* #s 571-90).  He was diagnosed with lower-extremity neuropathy, **likely diabetic**, and treated with Neurontin.  *Id*. at 578.

He returned to the hospital the following month with right-arm pain.  *Id*. at 598-608.  He described it as involving tingling and burning throughout his arm.  *Id*. at 606.  He was diagnosed with peripheral neuropathy.  *Id*. at 608.  He experienced this same pain in August 2013 and went to emergency room.  *Id*. at 627-52.

In July and November 2013, Plaintiff's primary-care physician treated Plaintiff's right-arm-neuropathic pain during office visits.  *Id*. at 1044-49. Subsequently, Plaintiff attended physical therapy sessions for his right-arm in December 2013 and January 2014. *Id*. at 1066-87.  He reported ten-out-of-ten pain that caused him to have problems bathing, dressing, and performing daily activities. *Id*.  Clinical abnormalities were recorded including reduced grip strength and diminished range of motion.  *Id*.

**C.     Medical Records: Ankle Fracture and After**

Plaintiff's health took a turn for the worse on May 21, 2014 when he was assaulted. During the course of the assault, he fractured and dislocated his right ankle.  *Id*. at 91, 1373, 1384-85; *see PageID* #s 90-91.  The fracture required surgery—an open reduction and internal fixation with the use of hardware, including screws.  A surgeon performed this surgery on June 6, 2014.  *See id*. at 1447-48.

Plaintiff went to Five Rivers Health Center on August 20, 2014. "Visit Notes" written by a Registered Nurse reveal that Plaintiff reported "constant swelling on R[ight] foot area and constant pain in bones of R foot—burning pain…. Patient interviewed and pain assessment done…." *Id.* He was prescribed Tramadol for pain and instructed to take Tylenol (not more than 4000 mg. per day). *Id.* at 1111, 1114. He was also prescribed a "kneeling walker." *Id.* at 1111. It appears that Frederick M. Reeve, M.D., signed these notes on August 21, 2014. *Id.* at 1112. Medication notes show that Plaintiff had also been taking Percoset (OxyCodone-Acetaminophen), doubtlessly for pain. *Id.* at 1113.

In September 2014, a surgeon removed two of the screws implanted during Plaintiff's previous (June 2014) right-ankle surgery. *Id.* at 1688. Within a week of Plaintiff's September 2014 surgery, he experienced severe right-ankle pain and went to the emergency room. *Id.* at 1683-1706. His ankle was swollen and tender to palpitation. *Id.* at 1683, 1692. An x-ray revealed diffuse osteopenia and a likely osteochondral defect ("difficult to exclude"). *Id.* at 1687.

Plaintiff's family doctor, Stephen Nudson, M.D., noted in late November 2014 that Plaintiff was experience right-ankle pain and swelling. The physician characterized these problems as "improving." *Id.* at 1762. Upon musculoskeletal examination, the physician commented that Plaintiff's right ankle was palpably tender, his gait was "normal," he had non-pitting ankle edema (swelling; excessive accumulation of tissue fluid[2]) as well as

---

[2] Taber's Cyclopedic Medical Dictionary at 638. (19th Ed. 2001).

reduced lower extremity reflexes and diminished foot sensation bilaterally. *Id*. at 1763.

Notes from Plaintiff's office visits with Dr. Knudson in mid-December 2014 indicate, "visual overview of all four extremities is normal" and "Extremity Normal No edema." *Id*. at 1758. There is no mention of Plaintiff's gait or use of a walker in these office notes. *Id*. at 1756-60.

The next notes from Dr. Knudson documented Plaintiff's visit seven months later, in July 2015. *Id*. at 1750-55. The "Assessment/Plan" noted shoulder pain without mention of right-ankle pain or plan. *Id*. at 1753. Plaintiff "explained worsening nerve pain from uncontrolled diabetes…." *Id*. A physical exam indicated "Cervical spine— muscle spasms and tenderness" but did not otherwise indicate musculoskeletal findings or refer to Plaintiff's gait or his use of a walker. *Id*. at 1754. That same month, Plaintiff also met with a cardiologist who recorded minimal compromise of Plaintiff's peripheral pulses. *Id*. at 1767.

Plaintiff established care with a podiatrist, Dr. Richmond, in July 2015. Her office notes indicate that Plaintiff was experiencing neurological disorder associated with type 2 diabetes, peripheral circulatory disorder associated with type 2 diabetes, "Venous Insufficiency of Leg," knee pain, "Joint Pain in Ankle and Foot." *Id*. at 1777. Physical therapy notes indicate (by a check-marked box) that Plaintiff was "Homebound." *Id*. at 1800. The physical therapist further reported, that since Plaintiff's right-ankle fracture and subsequent surgical fixation, he "continues to have difficulty with strength, ROM,

balance, gait patterns and pain.  He only uses a kneeling walker or a cane.  He reports multiple falls due to balance issues." *Id*.

"Nursing Intervention" notes on August 6, 2015 report that Plaintiff had neurologic weakness and unsteady gait. *Id*. at 1791.  He used a walker.  And he had pain in both his hips and legs. *Id*.  Similar notes on August 10, 2015 indicate that Plaintiff has neurologic weakness, and an unsteady gait. *Id*. at 1788.  He used a walker. *Id*.  He also reported pain in both feet and legs.  The physical therapist explained, "message left for Dr. instructed [Plaintiff] to keep taking ordered meds and keep legs elevated and cont[inue] with therapy…." *Id*. at 1789 (capitalization removed).

*Id*.

## D.     <u>Medical Source Opinions</u>

The record does not contain a treating physician's opinion about Plaintiff's work abilities.  Two state-agency physicians reviewed Plaintiff's medical records before his right-ankle fracture, dislocation, and surgeries.

In late January 2014, Elizabeth Das, M.D., reviewed the records for the state agency.  She reported that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently.  He could stand and/or walk about 6 hours in an 8-hour workday and stand about 6 hours in an 8-hour workday. *Id*. at 117.  He could occasionally climb ramps and stairs and never climb ropes, ladders, or scaffolds. *Id*. at 118.  She noted that Plaintiff had diabetes "not well-controlled" and his handling ability was "limited right." *Id*.

7

A few weeks before Plaintiff right-ankle fracture, dislocation, and surgeries, Maria Congbalay, M.D., reviewed his medical records and essentially reached the same conclusions as Dr. Das. *Id*. at 144-46.

## III.   "Disability" and The ALJ's Decision

To be eligible for Disability Insurance Benefits or Supplemental Security Income a claimant must be under a "disability" as the term is defined by the Social Security Act. *See* 42 U.S.C. §§423(a), (d), 1382c(a). The definition of the term "disability" is essentially the same both types of benefits. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job, and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See id.* at 469-70.

As noted previously, it fell to ALJ McHugh to evaluate the evidence pertinent to Plaintiff's applications for benefits. He did so by considering each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. §404.1520. His pertinent findings began at Step 2 with his determination that Plaintiff had the following severe impairments: diabetes mellitus, peripheral neuropathy in his feet and right arm, and asthma. (Doc. #6, *PageID* #45). He found at Step 3 that Plaintiff did not have an impairment or combination of impairments that automatically entitled him to benefits

under the Commissioner's Listings.  *Id.* at 48; *see* 20 C.F.R. Part 404, Subpart P,

Appendix 1.

At Step 4, the ALJ concluded that despite Plaintiff's impairments, he retained the

ability—his residual functional capacity—to perform a limited range of light work,

explaining:

> [He] can perform a reduced range of light work…: (1) lifting and
> carrying up to 20 pounds occasionally, and up to 10 pounds
> frequently, (2) standing and walking up to 6 hours, (3) sitting up to 6
> hours, (4) no climbing of ropes, scaffolds and ladders, (5) occasional
> climbing of ramps and stairs, (6) frequent stooping, kneeling[,]
> crouching, crawling and balancing, (7) no exposure to dangerous
> hazards such as unprotected heights or dangerous equipment, (8)
> occasional handling and fingering with the dominant (right), (9) no
> commercial driving as part of job duties, (10) no concentrated
> exposure to extreme heat, extreme cold, and extreme humidity, and
> (11) in addition to normal breaks, off-task 5% of the time.

(Doc. #6, *PageID* #48).  The ALJ also concluded at Step 4 that Plaintiff could not perform

his past relevant work.  And, at Step 5, the ALJ found that Plaintiff can perform a

significant number of jobs that exist in the national economy, and that he was, therefore,

not under a disability.  *Id*. at 53-55.

## IV.    Judicial Review

Judicial review of an ALJ's non-disability decision proceeds along two lines:

"whether the ALJ applied the correct legal standards and whether the findings of the ALJ

are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399,

406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 745-46 (6th Cir.

2007).  Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance...." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.     Discussion

### A.     The Parties' Contentions

Plaintiff raises 6 main contentions:

1. The ALJ erred in rejecting the residuals of Plaintiff's right ankle fracture as a severe impairment and subsequently identifying no limitations related to the same.

2. The ALJ's residual functional capacity finding is unreasonable and unsupported.

3. The ALJ considered the wrong onset of disability date.

4. The ALJ failed to adequately explain his opinion weighing.

5. The ALJ's credibility findings do not merit deference.

6. The ALJ's decision is not supported by substantial evidence and the Commissioner's position is not substantially justified.

(Doc. #7, *PageID* #1807).

The Commissioner finds no merit in Plaintiff's contentions because substantial evidence supports the following:  (1) the ALJ's determinations at Step 2; (2) the ALJ's finding that Plaintiff did not require an ambulation aid; (3) the ALJ's evaluation of the opinions provided by state-agency record reviewers; and (4) the ALJ's evaluation of Plaintiff's credibility.

### B.     Discussion

Step 2 of the sequential analysis—determining whether the claimant has a severe impairment—creates "a *de minimis* hurdle in the disability determination process....Under the...*de minimis* view, an impairment can be considered not severe only if

it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir.1988). Once an ALJ identifies at least one severe impairment at Step 2, he or she must continue the sequential evaluation. *See Fisk v. Astrue,* 253 F. App'x 580, 583 (6th Cir. 2007) (quoting, in part, Soc. Sec. Rul. 96-8p, 1996 WL 374184, *5; *see also* 20 C.F.R. §1520(a)(4). Indeed, an ALJ must consider all of a claimant's impairments—both severe and non-severe—"in the remaining steps [of the sequential analysis]." *Pompa v. Comm'r of Soc. Sec.*, 73 F. Appx. 801, 803 (6th Cir. 2003).

The ALJ found more than one severe impairment (diabetes, peripheral neuropathy, asthma) at Step 2 and, consequently, did not screen out Plaintiff's applications for benefits at Step 2. In this manner, the ALJ applied the correct legal criteria at Step 2. *See Fisk,* 253 F. App'x at 583.

Plaintiff correctly points out that the ALJ also found at Step 2 that Plaintiff's right-ankle fracture was not a severe impairment because "this condition did not persist at a 'severe' level for a continuous period of 12 months or more." (Doc. #6, *PageID* #45). The ALJ reasoned, "although [Plaintiff] sought emergency room treatment for residual right ankle pain following hardware removal surgery on September 22, 2014, x-rays at that time showed no significant abnormalities (Exhibit B18F at 558-562 [1688-92]). The record shows no further treatment for any significant right ankle complaints since that time." (Doc. #6, *PageID* #46).

The ALJ's citations to 4 pages from Plaintiff's September 22, 2014 medical records provides scant support for his conclusions. Contrary to the ALJ's statement, x-rays of Plaintiff's right ankle on September 23, 2014 showed "diffuse osteopenia." *Id*. at 1687. "Osteopenia" is "[a]ny decrease in the amount of bone tissue, regardless of the cause…." Taber's Cyclopedic Medical Dictionary at 1469 (19th Ed. 2001). By definition, then, diffuse osteopenia referred to widespread bone-tissue loss in Plaintiff's right ankle. Given this objectively documented abnormality, it was not reasonable for the ALJ to find no significant abnormalities in Plaintiff's right ankle in September 2014. The x-ray also revealed "screw tracks," which are significant abnormalities and certainly sound like a painful result of the recent surgical removal of two screws from Plaintiff's right ankle.

Perhaps the ALJ was referring to treatment notes from this time stating, "x-rays show no acute fractures or dislocations." *Id*. at 1692. If so, the ALJ should have also recognized that treatment notes next report the presence of "previous trauma with removal of hardware…." *Id*. If the ALJ was referring to the finding of no acute fracture or dislocation indicated by the x-ray, this was not a reasonable basis for finding no significant abnormality in the x-ray where it documents the significant abnormalities of diffuse osteopenia, screw tracks, and previous trauma with removal of hardware.

The ALJ also reasoned at Step 2 that Plaintiff's primary-care physician noted in November 2014 that Plaintiff's right-ankle pain and swelling was improving. Id. at 46 (citing Exhibit B20F, page 13 [*PageID* # 1762]). Without more, the term "improving"

13

leaves open a broad range of possibilities. Was his right ankle improving as expected or faster than expected? Was it minimally healed, moderately healed, or almost fully healed? "Improving" alone suggests some healing but little else. It was therefore unreasonable for the ALJ to infer anything significant from the single word "improving" as it is used in the Plaintiff's November 2014 treatment records. *See id*. at 1762.

The ALJ next wrote, "subsequent progress notes show no significant abnormalities of the right ankle." *Id*. at 46 (citing Exhibit B20F, pages 1-11 [*PageID* #s 1750-1760]). Yet, the ALJ's citations are from Plaintiff's visit to Dr. Knudson in December 2015 because he had the flu. Dr. Knudson notes indicate, "flu, "coughing up white to yellow phlegm + aches, chills, night sweats." *Id*. at 1756. It is not surprising that treatment notes concerning the flu do not address or document the condition of Plaintiff's right ankle or any related pain or problems. It would, moreover, appear to have been off-task for Dr. Knudson to evaluate Plaintiff's right ankle when treating him for the flu. The ALJ's reliance on Dr. Knudson's treatment July 2015 treatment notes overlooks this. Additionally, physical therapy reports at this time show that Plaintiff was using a "kneeling walker" and continued to have difficulty with strength, range of motion, balance, gait patterns, and pain. *Id*. at 1800. Nursing notes also report that in August 2015, Plaintiff had neurologic weakness, unsteady gait, used a walker. *Id*. at 1788.

The ALJ next recognized that Plaintiff testified during the hearing that he was no longer receiving any significant treatment for his ankle. The ALJ, however, does not cite

to hearing testimony, and a review of the testimony does not reveal that Plaintiff specifically stated he was no longer receiving significant treatment for his ankle. Even if Plaintiff testified in this manner, the ALJ's hearing occurred in September 2015, very near in time to office visits with Dr. Richmond, and the related physical-therapy and nursing interventions. Such evidence tends to show that Plaintiff was receiving treatment for his right ankle near the time of the ALJ's hearing. Perhaps Plaintiff was not planning to return to treatment with Dr. Richmond. The ALJ did not ask. The ALJ also did not ask Plaintiff for any information about his treatment when he questioned Plaintiff about his ankle injury and how it impacted his ability to walk. *See id*. at 89-90. Consequently, the record fails to reasonably support the ALJ's statement regarding Plaintiff's testimony. *See id*. at 67-98.

In light of the above analysis, substantial evidence does not support the ALJ's reasons for finding that Plaintiff's right-ankle injuries improved within 12 months. This problem led the ALJ to very briefly consider Plaintiff's right-ankle fracture when assessing his residual functional capacity at Step 4 of the sequential evaluation. The only mention at Step 4 referred to it as a "fracture," which is accurate, but does not indicate that it was simultaneously dislocated in May 2014. It is unclear from the ALJ's decision whether he fully appreciated that the injury was both a fracture and a dislocation of his right ankle. Nevertheless, even if the ALJ understood both aspects of Plaintiff's ankle injury, he only minimally noted at Step 4 that "a physical examination showed good range

of motion throughout all extremities with normal motor functioning and normal sensation. (Exhibit B18F, page 265 [*PageID* #1394]).” (Doc. #6, *PageID* #51). The reference to “good range of motion,” etc., reveals an ALJ straining to read a medical record towards a non-disability finding. This is seen in the records from the day Plaintiff fractured and dislocated his right ankle. They state, “Patient has a deformed right ankle….” *Id*. at 1394. Later in the same paragraph, the records state, “good range of motion in all major joints.” *Id*. When viewed in context—in the presence of Plaintiff’s fractured and dislocated right ankle—this note cannot be reasonably read to mean that Plaintiff had good range of motion in his “deformed right ankle.” *See id*. It would be surprising to find that a physician would test a deformed or fractured or dislocated ankle for range of motion, let alone find such a badly injured ankle had “good range of motion.”

The ALJ also explained at this point in his decision, “during an emergency room visit in January 2014, the claimant was observed as walking with a normal gait.” *Id*. at 51. This, however, says nothing about Plaintiff’s ability to walk after he fractured and dislocated his right ankle in May 2014. Elsewhere in the ALJ’s Step 4 analysis, he referred to Plaintiff’s normal ability to walk. He noted, for example, in January 2010, “claimant was … observed as ambulating without difficulty”; in May 2013, “claimant walked with a steady gait”; and in August 2013, “the claimant was observed as walking with a study gait.” *Id*. at 50. Such observations were certainly relevant to the ALJ’s assessment of the impact Plaintiff’s peripheral neuropathy had on his ability to walk. But,

because the references pre-date Plaintiff's right-ankle fracture and dislocation in May 2014, they provide no probative information about his walking ability on or after his significant ankle injury and resulting surgeries. The ALJ, moreover, appeared to rely on such pre-ankle fracture evidence as a reason to reject Plaintiff's need for a walker. The ALJ explained, "when considering the relatively minimal objective findings discussed above and documentation of a steady gait on several occasions…, the use of an ambulatory aid is not medically necessary." *Id*. at 52. The ALJ's previous discussion, however, does not rely on evidence that post-dated Plaintiff's May 2014 right-ankle fracture and dislocation and resulting surgery. To the extent the ALJ was relying on findings in the record concerning Plaintiff's normal or steady gait, those records pre-date his serious right-ankle problems in and after May 2014. Dr. Richmond's specifically document that Plaintiff's gait was unsteady and/or antalgic. *Id*. at. 1788, 1791, 1793-99.

Turning to the ALJ's reliance on the record-reviewing physicians' opinions, Plaintiff maintains that the ALJ failed to provide any meaningful explanation of their opinions. The Commissioner argues that although ALJs must consider the applicable regulatory factors when weighing state-agency physicians' opinions, ALJs do not need to discuss each factor and must only "explain the weight given to these medical opinions." (Doc. #10, *PageID* #1828) (citing Soc. Sec. R. 96-6p, 1996 WL 374180 (July 2, 1996). The Commissioner further contends that Plaintiff has not and cannot show that the ALJ's review of the state-agency physicians'' opinions was insufficient.

The ALJ placed significant weight on the opinions provided by Drs. Das and Congbalay. His explanation states, "their assessments are generally supported by objective signs and findings in the preponderance of the evidence." (Doc. #6, *PageID* #52).

Substantial evidence does not support the ALJ's reasoning because the records from the time of Plaintiff's right-ankle injury, his subsequent surgeries, treatment (including, but not limited to, Dr. Richmond's 2017 records) document objective signs and findings not considered by Drs. Das and Congbalay at the time of their record reviews, which occurred before Plaintiff seriously injured his ankle. Because Plaintiff's right-ankle fracture, dislocation, and surgeries dramatically altered his health and work abilities, the ALJ erred by ~~overlooking~~ relying on the state-agency physicians' opinions without addressing their opinions in light of the ankle-injury evidence. When the evidence in and after May 2014 is considered, there is more than a preponderance of evidence concerning Plaintiff's health and work limitations that conflict with the opinions provided by Drs. Das and Congbalay. As such, as to evidence dated on and after Plaintiff's ankle injury in May 2014, substantial evidence does not support the ALJ's conclusion that the objective signs and findings in the preponderance of evidence generally support the opinions provided by Drs. Das and Congbalay. *Cf. Dapice v. Comm'r of Soc. Sec.*, 2015 WL 4540538, at *6 , n.5 (S.D. Ohio, 2015) (Newman, M.J.) ("The Court finds that the lack of any meaningful analysis of any of the opinions offered by these four [state-agency] medical sources fails

to comply with the requirements of 20 C.F.R. § 416.927 and therefore, substantial evidence fails to support the ALJ's according these opinions 'significant weight.'").

Accordingly, for all the above reasons, Plaintiff's contentions are well taken.[3]

## VI.    Remand For Benefits

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746.  Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits.  *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir.

---

[3] In light of the above review and the resulting need for remand of this case, analysis of the parties' remaining arguments is unwarranted.

1994).  The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking.  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is warranted in the present case because the evidence of disability is overwhelming or strong while contrary evidence is lacking.  Since turning age 50, Plaintiff has been a person closely approaching advanced age" under Social Security's definition of the term.  *See* 20 C.F.R. §404.1563(d).  The ALJ found that Plaintiff cannot return to any of his past relevant work.  (Doc. #6, *PageID* #53).  Under these facts and in light of the Medical Vocational Guidelines, Plaintiff would be found disabled if his residual functional capacity reduced from light to sedentary exertion. *See* 20 C.F.R. Appendix 2 to Subpart P of Part 404, §201.16.  The evidence of record is overwhelming or strong while contrary evidence is lacking that Plaintiff is limited to sedentary work after injuring his right ankle.  Considering that a restriction to sedentary work represents an overtly necessary accommodation for Plaintiff's right-ankle impairment, the ALJ's rejection of that impairment was directly material to his non-disability finding.  Further, Plaintiff's place on the Commissioner's Medical Vocational Guidelines, specifically Grid Rule 201.16, establishes that he is conclusively disabled and entitled to an award of benefits.

Accordingly, reversal of the ALJ's decision and remand for an award of benefits from the date Plaintiff's injuries his right ankle in May 2014 is warranted.

**IT IS THEREFORE RECOMMENDED THAT:**

1. The Commissioner's non-disability finding be reversed, in part, and the matter be remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for payment of benefits based on the disability onset date of May 21, 2014;

2. To the extent Plaintiff seeks benefits based on the disability onset date of June 23, 2013 until May 20, 2014, the ALJ's decision be affirmed; and

3. The case be terminated on the docket of this Court.


February 5, 2018                          *s/Sharon L. Ovington*
                                          Sharon L. Ovington
                                          United States Magistrate Judge

# NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).